## STANOLIND (formerly SINCLAIR) PIPE LINE CO. v. HASSELL.

No. 22490. Opinion Filed Nov. 17, 1931.

Rehearing Denied Jan. 12, 1932.

Clay Tallman and T. W. Arrington, for petitioner.

Emerson & Duncan, for respondents.

McNEILL, J. This is an original action to review an order and award of the State Industrial Commission. The respondent, Clyde Hassell, was an employee of the petitioner, and on March 25, 1930, sustained an accidental personal injury arising out of and in the course of his employment, when a piece of iron known as a gauge hatch weighing 15 or 20 pounds fell off a tank a distance of about 30 feet, striking respondent on the side of the head. Respondent received immediate medical attention at the McBride Reconstruction Hospital and Clinic at Oklahoma City, Okla. On April 1, 1930, he was removed to St. Johns Hospital at Tulsa, and placed under the care of Dr. F. L. Flack, where he remained until May 8 1930, at which time respondent was released as having fully recovered from the injury. Within a few days thereafter respondent returned to work for the company for approximately two and one-half weeks.

After respondent was released by the attending physician, a settlement agreement, dated June 23, 1930, was entered into between petitioner and respondent on State Industrial Commission form No. 7, entitled Stipulation and Receipt. Under the terms of this stipulation and receipt respondent was paid compensation at the rate of $15.39 for a period of 11 weeks and five days, in the total amount of $184.68. This stipulation and receipt was filed with the State Industrial Commission on June 26, 1930. On June 30, 1930, the Commission issued its order approving the stipulation and receipt, finding that claimant was injured March 25, 1930; that disability ended June 21, 1930; that respondent received compensation for temporary total disability to the head at the rate of $15.39 per week for said period of 11 weeks and five days, based on a wage of $4 per day, and finding that respondent had received compensation for said period in the amount of $184.68. The Commission approved said amount, paid for temporary total disability, and ordered that the case be closed. On August 23, 1930, respondent filed with the Commission his motion to reopen on the ground of fraud and change of condition. In said motion said respondent states in part as follows:

"3. That at the time said settlement was made, claimant was working, but that shortly thereafter, the claimant's physical condition became worse and he was forced to cease work, and about three weeks after said settlement was made, claimant was forced to quit work because of pains in his neck and head, and because of attacks of dizziness; and that claimant has been unable to work since that time.

"4. That the time said settlement was made, claimant was induced to make same by representations of the respondent's physician (one Doctor Flack of Tulsa, Okla.) to the effect that the claimant had no injury that would have any permanent effect, and that said Doctor Flack assured the claimant that his skull had not been fractured in the said accident.

"5. That claimant has since learned that said representations were false and that, in fact, his skull was fractured in the accident which he sustained on the 25th day of March, 1930, and that as a result of said accident, claimant has a permanent disability"

—and prays that a hearing be had and the settlement made on the 23rd of June, 1930, be set aside on the ground of fraud, and on the further ground that the physical condition of claimant has changed for worse since said settlement was made, and that he be awarded costs of medical and dental attention and further compensation. Hearing on this motion was had on April 1 and 2, 1921, before the Commission, and thereafter on May 21, 1931, an order was entered awarding to respondent compensation at the rate of $15.39 per week until other-

wise. ordered by the Commission and the costs and reasonable medical expense; the material portion of the award being as follows:

"Now, on this 21st day of May, 1931, the State Industrial Commission * * * finds:

"(1) That, on and prior to March 25, 1930, claimant, Clyde C. Hassell, was in the employ of respondent, Sinclair Pipe Line Company; that while working at base of tank, hatch fell off top of tank, striking claimant on top of head, fracturing skull.

"(2) That claimant was paid compensation in the amount of $184.68 for temporary total disability, being 11 weeks and 5 days.

"(3) That the average daily wage of claimant at the time of the accident was $4.

"The Commission is of the opinion: By reason of the aforesaid facts, that claimant is entitled to compensation from August 23, 1930, to April 2, 1931, computed at the rate of $15.39 per week, making a total of $484.78, being 31 weeks and 3 days, and continued thereafter until otherwise ordered by the Commission, and also such reasonable medical expense as has been incurred by claimant by reason of said injury and continued treatment until otherwise ordered by the Commission.

"It is therefore ordered: 'That within 15 days from this date, respondent, Sinclair Pipe Line Company, pay claimant the sum of $484.78, being compensation at the rate of $15.39 per week, computed from August 23, 1930, to April 2, 1931, and any compensation remaining due from April 2, 1931, to date, and continuing thereafter weekly at the rate of $15.39 per week until otherwise ordered by the Commission, and also pay such reasonable medical expense as has been incurred and will be incurred by claimant by reason of said injury. * * *"

Petitioner urges that the award is defective and illegal and should be set aside and vacated for the following reasons:

"(1) The Commission was without authority to reopen and award further compensation in this case in the absence of a showing and finding that there has in fact been a change of condition since the original award was made, and that such change of condition was due to the original injury. There is no testimony to support a finding of change of condition after the award.

"(2) That there is no evidence whatsoever in the record of the testimony taken at the aforesaid hearing of April 1 and April 2, 1931, to support the finding that claimant had sustained a fractured skull, and the cause should therefore be reversed.

"(3) The Commission failed to find that claimant was suffering from any disability as a result of the injury, and such a finding is a conclusion of fact necessary to support the award."

It is the contention of respondent that respondent has suffered a change of condition, that such a change of condition was the result of the original injury, and that there is ample testimony in support of this contention. Respondent contends that he was led to believe by representatives of petitioner that his condition was not serious and that he was able to return to his work. The respondent testified that Dr. Flack told him, at the time the settlement was being made, in reference to his physical condition and ability to resume work, as follows:

"A. Dr. Flack recommended I could do light work and he said that I could have some light work down here. Q. And was anything said as to whether or not the skull had been fractured? A. He said it had not, I believe. Q. You were able to do light work? A. Yes, sir. Q. Following that settlement within a few days you did come down to Oklahoma City and do some light work for the Sinclair Company? A. I did, yes, sir. Q. About how long did you work for them, Mr. Hassell? A. About two weeks, something over two weeks. I don't remember just how long. Got in one pay, a little over one pay."

In this connection, Dr. Flack testified as follows:

"Q. Did you in any way influence him to make a settlement? A. No, I didn't make any settlement with the man. I told him I thought he was all right. I had had him under observation that length of time, which was from the 1st of April until the 14th of May, and that he would be all right to return to light work until he became toughened up and then to resume his usual occupation."

It appears from the record that, after the settlement was made, respondent returned to Oklahoma City and worked for the petitioner for about two weeks. Respondent testified that he completed the work at Oklahoma City and his foreman went to Meeker and informed the respondent that he would send for him. Not hearing from his foreman, respondent testified that he went to see him in reference to the work and was informed that as soon as the foreman received certain material he would put him to work. Not receiving word to come to take up this work, respondent tried to pick cotton and describes his condition as follows:

"Q. Well, standing on your feet there in the cotton field and bending over to pick the cotton, would that have any effect on you? A. When I stood up it did, yes. Q. How would it affect you? A. I stood on my knees all the time. It hurt my neck. Q. Your neck would pain? A. Yes; my head seemed like it was too full, or something. Q. Where did your neck hurt you? A. Right at the base of the skull, right in

there (demonstrating). Q. And what other kind of sensations did you have in your head? A. Well, it got too full. * * * Q. You got a job, didn't you, down here at the refinery cleaning out a tank or building a tank? A. We drove about an hour. Q. When was that? A. In July; I don't remember the date. Q. Where was that? A. It was Robinson—down on Robinson street. Q. Here in Oklahoma City? A. Oklahoma City. Q. How long did you work at that job? A. Just a half-day—three hours and a half—is what I got paid for. Q. What happened while you were working on that tank down there? A. We drove about an hour; I got pretty hot and fell off the scaffold. * * * Q. About how high was this scaffold you were working on? A. It wasn't over a foot high, about 18 inches or two feet high, maybe; we was driving around seam on the first round of the tank. Q. And from the exertion doing that there in the heat of that July day you became dizzy and tumbled off; is that it? A. Yes, sir; just fell off."

Dr. M. S. Gregory testified as follows:

"A. Now, his symptoms and dizziness fullness in the head and hard to remember, hard to think, complaint of pain in the neck; he said someone had told him there was some dislocation of the neck, and I saw one report there was a little variation of the neck vertebra; also, I saw a report there had been a fracture of the skull, but I did not study the plates myself; the slowness of thought and the inability to think clearly and his depression are the marked things which I find in this man's mentality. This man is suffering from a depression following a brain injury. I believe at the present time he is totally disabled. Q. This disability, in your opinion, is a traumatic origin? A. My diagnosis is a mental disease. That is, a certain type of psychoneurosis. A certain type of mental aberration. It might lead into total infirmity, and from the history it seems as though he was pretty close to the line, and this I believe depends upon the injury. Q. Doctor, if the evidence shows that on or about the 25th of March, 1930, this man was struck in the head by a metal instrument known as a cage—it weighed somewhere from 15 to 30 pounds, varying its weight—it falling a distance of about 30 feet, would you say that in your opinion the present trouble resulted from that injury? A. Yes. * * * Q. In your opinion, you say he is totally disabled from the performance of ordinary manual labor? A. Yes, I believe he is. Q. Due to this injury? A. Yes, I think so. Q. Now, Doctor, what is your opinion as to the permanency of this disability? A. I can't help but say this is quite permanent, however, I feel it is proper to observe this man, say, for six months. Now, if there is no variation in this man or if he gets worse at the end of six months, I feel it would be quite justifiable in feeling this is a permanent degeneration."

Dr. Walter T. Dardis testified as follows:

"Q. Did the inability to do work still exist on your examination of March 27? A. March 26th. Yes, sir. Q. Was he able to do manual labor at the time, Doctor, a few days ago? A. I don't think he is able to do anything, because he hasn't got the mentality to carry it on. * * * Q. Doctor, in your opinion, is the disability which you found a few days ago, and the disability which you found in July, 1930, due to an injury which he received in March, 1930? A. I don't know any other cause for it."

Dr. Margo, who waited on the respondent as an emergency on the 25th of March, 1930, testified as follows:

"Q. What would you say, Doctor, irrespective of the question of fracture, as to whether or not this man had a brain injury? A. I think he had a brain injury."

Dr. C. J. Fishman also testified as follows:

"Q. If the evidence showed, Doctor, this man does suffer from headache and dizzy spells and pains in his neck at the base of the skull, would you then say that was a case of neurosis? A. Then I would certainly say it is a case of traumatic neurosis instead of a mental attitude in which he is disinclined to work."

Several lay witnesses testified in reference to the apparent change of the condition of respondent to the effect that prior to the accident he appeared to be a man of ordinary intelligence, but that a change of mental attitude and general demeanor of respondent was noticeable since the accident.

Petitioner contends that there is no evidence to justify the finding that respondent received a fractured skull as a result of the gauge hatch falling off the top of the tank. Dr. E. Margo testified as follows:

"A. I interpreted the X-ray record as follows: There is a fracture; what appears to be a fracture of the outer and inner tables. Q. Have you read it as you wrote it at the time, Doctor? A. There is a fracture of the outer and inner tables or fractured bone or recurrence of it extending into the parietal bone, but not distinct. Q. That is an interpretation that you made of the X-ray on the day the man was admitted to the hospital? A. Yes, sir."

There is other expert testimony to the effect that it was doubtful as to whether or not there was a fracture of the skull and that there was no connection with the injury sustained and the present condition of the respondent. There is testimony that respondent was in the tertiary or third stage of syphilis, and that his present mental retardation is due to a long period of time, and that the degeneration of his mental powers is not due to and a result of the injury, but is a matter of old standing, and, on the other hand, there is expert testi-

mony that there is no evidence that respondent is suffering from syphilis. The evidence of the doctors is conflicting in reference to the fracture and as to whether or not the condition of respondent at the time of the hearing on May 21, 1931, was due to the traumatic injury received on the head by respondent. These were questions of fact for the determination of the Commission, and the same are binding upon this court. This court will not weigh conflicting evidence to determine the weight and value thereof. There is competent evidence reasonably tending to support the finding of the Industrial Commission that respondent suffered a fractured skull, and that his condition had changed subsequent to the award entered on the 23rd of June, 1930.

Petitioner also urges that the Commission failed to find that the respondent was suffering from any disability as a result of the injury, and that the award is unsupported by the record. We are of the opinion that this contention is without merit. There is no request for any special finding on behalf of petitioner.

The following colloquy took place during the examination of Dr. Gregory on the question of the loss of hearing of respondent:

"By Mr. Arrington: Your Honor, in a case where counsel is contending a total disability, can you take some loss of hearing if he is totally disabled? The other wouldn't have anything to do with it. By the Court: We want to get all the facts pertaining to the disability; of course, if he is totally disabled, that is true. By Mr. Duncan: We are only trying to show this man is totally disabled."

The record shows that this case was tried before the Commission upon the theory that respondent was totally disabled. The evidence at the time of the last hearing amply sustains an award for compensation based upon temporary total disability, which temporary total disability may or may not subsequently become a permanent total disability or come within one of the other classes, permanent partial, or temporary partial disability, as provided for by section 7290, C. O. S. 1921, and amendments thereto (Laws 1923, c. 61, s. 6). Dr. Gregory testified that in his opinion respondent was totally disabled from the performance of ordinary manual labor. Dr. Dardis testified to the same effect, and that respondent was unable to do anything because he did not have the mentality to do so. In response to a question as to whether or not respondent's injury was permanent, Dr. Dardis answered as follows:

"A. Time will have to tell more in regard to his permanent disability, in those cases whether it is total or whether it is partial because some of them will recover often times and some of them will gradually grow worse. Q. Doctor, in your opinion, is the disability which you found a few days ago and the disability which you found in July, 1930, due to an injury which he received in March, 1930? A. I don't know any other cause for it."

The Commission made its award for compensation for an undetermined period coming within the provisions of the classification of temporary total disability. In the event respondent's condition does not change, he is entitled under the evidence and award to be paid compensation at the rate fixed in said award for a period not to exceed 300 weeks. On the other hand, the Commission on its own motion, or on the application of any party in interest, may, on the ground of change of condition, review its award to determine at any time before, or at the expiration of such period of 300 weeks, whether said temporary disability has ceased or whether it falls within the other designated classes provided for in section 7290, O. O. S. 1921, supra, and amendments thereto, to wit, permanent total disability, permanent partial disability and temporary partial disability, and render such additional compensation, if any, in accordance therewith under the provisions of aforesaid section 7290, supra.

At the time of the last hearing, the evidence tends to support the conclusion that respondent's wage-earning capacity was at least temporarily, if not permanently, totally destroyed, and that by reason thereof respondent was totally disabled. As to whether the same would cease or pass into any of the other schedules of compensation under section 7290, C. O. S. 1921, supra, would be a question of fact for future determination.

There is a general finding by the Commission that respondent is entitled to the award in question, and such finding is a general finding of fact, and is a finding of every special thing necessary to be found to sustain the general finding, and is conclusive upon this court upon all doubtful and disputed questions of fact. Indian Territory Illuminating Oil Co. v. Crow, 147 Okla. 229, 296 P. 451.

After a careful examination of the record, we find no error, and the award is affirmed.

CLARK, V. C. J., and RILEY, SWINDALL, ANDREWS, and KORNEGAY, JJ., concur. LESTER, C. J., and HEFNER and CULLISON, JJ., absent.